

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:JAM
F. #2017R01195

*610 Federal Plaza*
*Central Islip, New York 11722*

December 14, 2017

By ECF & Hand

The Honorable A. Kathleen Tomlinson
United States Magistrate Judge
Eastern District of New York
Central Islip, New York 11722

      Re:    United States v. Zoobia Shahnaz
                Docket No. 17-CR-690 (SJ)

Dear Judge Tomlinson:

      The government respectfully submits this letter in anticipation of the above-referenced defendant's arraignment on the enclosed indictment (the "Indictment"). For the reasons detailed below the government requests that a permanent order of detention be issued pursuant to 18 U.S.C. § 3142(e).

## INTRODUCTION[1]

      Yesterday evening, Federal Bureau of Investigation ("FBI") agents and members of the Joint Terrorism Task Force ("JTTF") arrested the defendant, Zoobia Shahnaz, pursuant to an arrest warrant, following the grand jury's return of the Indictment. The Indictment charges the defendant with one count of bank fraud, one count of money laundering conspiracy, and three substantive money laundering counts, relating to a pattern of conduct in or about and between March 2017 and August 2017.

---

[1] This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial. Where the content of statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance.

As detailed further below and as alleged in the Indictment, the defendant engaged in a scheme to defraud several financial institutions, allowing her access to over $85,000 in illicit proceeds. The defendant then wired these funds to various individuals and front companies overseas. The investigation has revealed that the defendant stole and laundered these funds abroad to support the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization ("FTO").[2] Indeed, on July 31, 2017, the defendant herself planned to travel to Syria and join ISIS.

For the reasons stated below, the defendant presents an irremediable flight risk and an extreme danger to the community. Accordingly, she must be detained pending trial.

FACTUAL BACKGROUND

I.  The Defendant

The defendant is a 27-year old citizen of the United States who was born in Pakistan and currently resides on Long Island in Brentwood, New York. She has no known criminal history. Up until approximately June 15, 2017, she worked as a lab technician at a hospital in Manhattan and earned approximately $71,000 per year. In or about January 2016, the defendant travelled to Jordan to volunteer with the Syrian American Medical Society. For two weeks, she assisted in providing medical aid to Syrian refugees in Amman and in the Zataari Refugee camp, where ISIS exercises significant influence.

II.  The Defendant Defrauded Numerous Financial Institutions and Laundered the Money Overseas

In or about and between March 2017 and the date of her attempted travel to Syria on July 31, 2017, the defendant engaged in a scheme defraud numerous financial institutions, netting over $85,000 in illicit funds. She then made several wire transactions to individuals and opaque entities in Pakistan, China and Turkey, which were designed to avoid transaction reporting requirements and conceal the identity, source and destination of the illicitly-obtained monies. These transactions were motivated to benefit ISIS, which the defendant ultimately sought to join in Syria.

A.  The Bank Fraud Scheme

As charged in the Indictment, on or about and between March 12, 2017 and March 28, 2017, the defendant applied for and fraudulently obtained approximately six credit cards. Subsequently, in or about and between June 2017 and July 2017, she used these credit cards – along with at least ten other credit cards in her name – to purchase approximately $62,703.61 in Bitcoin and other cryptocurrencies from various internet exchanges. Bitcoin and other cryptocurrencies are digital currencies in which encryption techniques are used to

---

[2] To date, ISIS remains a designated FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. Abu Bakr al-Baghdadi is ISIS's self-proclaimed caliph or leader.

2

regulate the generation of units of currency and verify the transfer of funds. Cryptocurrencies operate independently of formal banking structures and provide layers of anonymity to their users. Persons engaged in illicit activity such as money laundering and terrorist financing may use cryptocurrencies to avoid detection by law enforcement or intelligence services. Most of these cryptocurrencies that the defendant purchased were then converted to U.S. dollars and transferred into a checking account in the defendant's name ("Bank Account 1").

Additionally, on or about June 5, 2017, the defendant applied for and fraudulently obtained a loan of approximately $22,500 from a bank in Manhattan. These monies were also deposited into Bank Account 1 on June 8, 2017.

### B. Laundering of the Illicit Proceeds Overseas

As the defendant obtained stolen funds as a result of her bank fraud scheme, she engaged in a pattern of financial transactions to move the money out of the U.S. and benefit ISIS. These transactions were designed to disguise the nature of the funds, the purpose of the transactions, and avoid currency transaction reporting requirements.[3]

For example, on or about May 23, 2017, the defendant sent two separate payments of $4,000 and $3,000 to an individual in Pakistan ("John Doe #1") from a Queens-based money remittance service. That same day, the defendant remitted approximately $10,025 from a checking account in her name ("Bank Account 2") via wire transfer, ostensibly to a medical supply company in the Zhejang Province of China.

One week later, on or about May 30, 2017, the defendant withdrew approximately $22,000 in cash in three separate transactions - $5,000, $8,000 and $9,000 withdrawals – from accounts in her name at three different banks, including Bank Account 1 and Bank Account 2. With that cash, she sent the following four wire payments later that day from a Queens-based money remittance service:

- Two separate payments of $4,500 and $3,500 to an individual in Karachi, Pakistan (John Doe #2)
- Two separate payments of $4,500 apiece to another individual in Karachi, Pakistan (John Doe #3)

The following day, on or about May 31, 2017, the defendant wired an additional $20,025 to an account belonging to the aforementioned Chinese medical supply company.

Records from Bank Account 1 show that on or about July 21, 2017, the defendant made a $100,025.00 remittance via wire transfer to an individual in Ankara,

---

[3] Most notably, federal law requires financial institutions to report any deposit, withdrawal, exchange of currency, or other payment or transfer of funds involving more than $10,000.

3

Turkey (John Doe #4). This transaction occurred days before the defendant's attempted travel to Syria and depleted almost all of the funds in Bank Account 1.

To date, the defendant has not paid payments on the credit cards and loans utilized in the scheme.

III.     The Defendant's Fraud and Financial Crimes Were Designed to Support ISIS

In committing the above-described crimes, the defendant sought to provide support to ISIS. Specifically, the investigation has revealed that, during the time she was committing bank fraud and moving money overseas, the defendant accessed ISIS propaganda, violent jihad-related websites and message boards, and social media and messaging pages of known ISIS recruiters, facilitators and financiers. Additionally, the defendant conducted numerous internet searches for maps of and locations within ISIS-controlled territory in Syria, and attempted to locate information that would facilitate her entry into Syria.

As early as August of 2015, defendant conducted extensive internet research on making "hijrah" to Syria and joining the ISIS. Hijrah means "migration," and refers to the migration of the Prophet Mohammed and his followers from Mecca to Medina. The term is used by ISIS to describe Muslims from around the world coming to Syria and joining the Islamic State established by ISIS.[4] Example of the websites and social media pages the defendant accessed include titles such as "Hijrah Checklist," "Hijrah Tips and Reminders," "a message to the hesitant one from jihad hijrah," and "what made you join [ISIS]."

This activity increased during the period of the defendants bank fraud and money laundering activity and immediately prior to her attempt to travel to Syria on July 31, 2017. Specifically, the defendant engaged in, <u>inter alia</u>, the following internet activity in or about May 2017 through June 2017:

- Google searches for and accessed pages of known ISIS recruiters, financiers, and fighters, including those who have urged lone-wolf attacks against American targets;
- A Google search for "diwan and their functions isis";
- Videos of ISIS members from the United States and Europe urging Muslims to carry out attacks in Western countries;
- Accessing ISIS-produced internet magazines, including an issue which featured various suggestions to ISIS sympathizers living in the West for hostage takings and attacks;
- Travel-related Google searches, such as "flights to Istanbul," "taking cash while travelling abroad," "travel checks in Turkey," "ATM machine withdrawal limit in

---

[4] For example, in February 2015, ISIS published a fifty-page English-language manual distributed online, entitled "Hijrah to the Islamic State, 2015," which served as a guide for prospective foreign fighters from Western countries who wanted to join the ranks of ISIS in Syria.

Turkey," "how much money can I send myself western union," "hotels in Istanbul close to airport," "how much overdraft can I get," and "sanctions definition";
- Google search for "medical students ISIS" and accessed the "khilafamedics" Tumblr page;
- Accessing maps of locations along the Turkey-Syria border and cities inside of ISIS-controlled territory; and
- Articles about women joining and fighting for ISIS, including one entitled "Islamic State: Who are the Top Female Jihadis".

The defendant has also made statements to third parties that, in substance, it is every Muslim's duty to support the Islamic State under al-Baghdadi and travel to Syria.

IV. After Effectuating Her Fraud and Money Laundering Schemes, the Defendant Attempted to Travel to Syria

Unbeknownst to her family, the defendant obtained a Pakistani passport and quit her job in June of 2017. On July 31, 2017, while her family believed she was heading to work, the defendant actually went to John F. Kennedy international airport ("JFK") to board a flight to Islamabad, Pakistan. Her itinerary included a multi-day layover in Istanbul, Turkey – a common point of entry for individuals travelling from Western countries to join ISIS in Syria. The defendant's return ticket had been booked for September 4, 2017 on a Turkish Airlines flight from Istanbul to JFK.[5]

At JFK airport, the defendant agreed to speak with law enforcement agents who intercepted her at the gate. The defendant stated, in sum and substance and in pertinent part, that she had scheduled her trip the previous week and planned a six-day layover in Istanbul in order to visit particular mosques and tourist sites. When asked where she planned on staying in Istanbul, the defendant stated that she was unsure. She further stated that she did not know anyone in Istanbul.

During the interview, the defendant was asked about some of the aforementioned overseas wire transactions. She provided false and conflicting explanations, alternately claiming that the transfers were at the behest of an individual she had met on social media, and later for a distant relative in Pakistan. She stated that she was unaware what the money was for and refused to provide further details, saying that such information was "confidential." Additionally, the defendant admitted that she was carrying

---

[5] In its various online guides for those who wish to make hijrah and join the Islamic State via Turkey, ISIS recommends that individuals purchase round-trip itineraries, as one-way tickets to Istanbul will be deemed suspicious by law enforcement. ISIS also recommends that individuals pose as tourists and familiarize themselves with various tourist attractions in Turkey in order to successfully deflect law enforcement questioning and scrutiny. Notably, the defendant had previously conducted internet searches for "one-way tickets to Istanbul."

5

approximately $9,500 in cash, which she did intentionally in order to avoid currency reporting requirements.

The defendant was also in possession of several electronic devices, and she voluntarily provided written consent for law enforcement to search those items. Analysis of those items show that the defendant took steps to delete stored communications and information prior to her attempted travel on July 31, 2017. This is consistent with tradecraft practiced by individuals seeking to travel to Syria and join ISIS

ARGUMENT

I.   Legal Standard for Detention

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

The rules governing admissibility of evidence at trial, however, do not apply in a detention hearing. See 18 U.S.C. § 3142(f); Fed. R. Evid. 1101(d)(3). Accordingly, under the Bail Reform Act, when detention is at issue, the government may proceed by proffer, United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same), and so may the defendant, Martir, 782 F.2d at 1145.

II.   The Defendant Should Be Detained Pending Trial

The nature and circumstances of the offense charged, the strength of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the threat presented by the defendant all support her detention as both a danger to the community and a risk of flight.

6

A. The Defendant Is a Danger to the Community

It is self-evident that the defendant poses a danger to the community given that her conduct demonstrates an allegiance to a terrorist organization. Indeed, the evidence uncovered demonstrates that the defendant has embraced an extremely violent ideology that advocates committing violent jihad in the United States and abroad. See United States v. Farah, No. 15-MJ-312(2), 2015 WL 2353075, at *4 (D. Minn. May 15, 2015) (finding that a defendant poses a risk of harm to the community where he is "charged with attempting to join the most violent terrorist organization, ISIS"); United States v. Salkicevic, No. 15-CR-0060, 2015 WL 525556, at *2 (N.D. Ill. Feb. 10, 2015) (finding that, where a defendant is charged with conspiring to provide material support and resources to ISIS, the charged offense "could scarcely be more serious").

By virtue of the charged conduct in the Indictment, the defendant has already transferred over $100,000 to support a foreign terrorist organization that commits and inspires violent atrocities, both in the U.S. and around the world. The defendant's effort to travel to Syria shows that the defendant poses a pervasive risk of harm to civilians, both in the United States and abroad. See Salkicevic, 2015 WL 525556, at *2 (consideration of safety of the community "can, of course, include foreign communities"); see also Farah, 2015 WL 2353075, at *4 (finding dangerousness because there would be harm to the wider community of civilians in the Middle East if the defendant were successful). Certainly, if the defendant were to follow ISIS's directive of committing attacks in the United States – including the those delineated in the aforementioned webpages that the defendant accessed – the risk of harm would be even more acute.

Taken together, this evidence overwhelmingly supports a finding that the defendant is a danger to the community.

B. The Defendant Presents an Extreme Flight Risk

In addition to the above, the defendant also constitutes a flight risk due to the seriousness of the offenses, the strength of the evidence, and the severity of the penalties that she faces. Her contacts abroad, facility in complex and deceptive transnational money movements, and her affiliation with a foreign terrorist organization only exacerbate these risks.

First, the nature and circumstances of the offenses charged weigh heavily in favor of detention. The seriousness of the offenses speaks for itself, and given the effort required to commit such a complex and deceptive fraud, it would be logical to infer and conclude that the defendant would go to equal, if not greater, lengths to avoid going to federal prison. Thus, considering the duration and complexity of her criminal conduct, and the fact that the charges include multiple crimes of false statements and deceit, the defendant cannot be trusted to return to court. See United States v. Saani, 557 F. Supp. 2d 97, 98-99 (D.D.C. 2008) (tax-perjury defendant's "alleged purposeful and illegal concealment of…access" to funds in foreign bank accounts was "directly relevant to [his] flight

7

risk"); United States v. Anderson, 384 F. Supp. 2d 32, 39 (D.D.C. 2005) (defendant's "historical unwillingness to be forthright in his dealings with government officials" relevant to flight risk).

Second, the weight of the evidence against the defendant is considerable. The voluminous bank and internet records described above comprise just some of the evidence against the defendant. Where, as here, the evidence of guilt is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2nd Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). Similarly, the possibility of a severe sentence is an important factor in assessing a defendant's incentive to flee. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); Martir, 782 F.2d at 1147 (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Third, the defendant has foreign ties that would facilitate her flight. She has familial ties in Pakistan, and the very nature of her offense conduct demonstrates that she is connected with individuals that can assist her travel beyond the reach of the Court's jurisdiction. The defendant's July 31, 2017 attempted travel to Syria, notwithstanding her U.S. citizenship and the presence of immediate family in New York, demonstrates that her ties to the community do not mitigate her flight risk. See Farah, 2015 WL 2353075, at *4 (finding that a defendant poses a risk of flight where part of the offense conduct involves attempting to travel overseas to join a terrorist organization); Mercedes, 254 F.3d at 437 (finding that U.S. citizenship and offer by immediate family members to serve as suretors did not overcome presumption of flight risk where defendant's past conduct evidenced flight risk). Equally, the fact that her live-in family members had no knowledge that she quit her job, obtained a foreign passport, and planned to travel shows that they do not exercise moral suasion over her or her actions.

Finally, given the defendant's conduct and contacts, it is likely that she has access to heretofore unidentified assets that she could readily access to finance her flight. Courts have repeatedly held that a defendant's ability to conduct complex financial transactions, and the access to funds that this ability entails, increases the risk of flight. The decisions in Anderson and Saani, cited above, are instructive. In Anderson, the court explained that the defendant's offenses "demonstrate substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and a facility for concealing the existence and location of significant quantities of money and other assets," which "clearly suggests that [the defendant] is a flight risk." 384 F. Supp. 2d 32, 39. Likewise, in Saani, the

defendant was a dual citizen of the United States and Ghana charged with failing to report on his tax return his interest in foreign accounts. 557 F. Supp. 2d at 98. The court explained that, while Saani's offense was neither violent nor a drug crime, "it is a crime of deception with direct relevance to [his] ability to support himself overseas." Id. That ability helped persuade the court that Saani was a serious flight risk and that pre-trial detention was warranted. Id at 99-100.

Of course, the facts and circumstances surrounding the instant case make the risk of flight even more severe. It is clear from the defendant's conduct that she never planned to return to the U.S. – she quit her job, deliberately incurred debts that she never intended to repay, and sought to reside in Syria. Given that law enforcement disrupted these plans, it is likely that the defendant is even more prone to impulsive and violent criminal behavior, including fleeing the country. See United States v. Kandasamy, No. 06-CR-616, 2008 WL 2660610, at *4 (E.D.N.Y. July 3, 2008) (Dearie, J.) (18 U.S.C. § 2339B case) (finding that the defendant posed a risk of flight despite U.S. citizenship and living with family because possibility of significant prison term, weight of the evidence, and affiliation with foreign terrorist organization).

## CONCLUSION

For the reasons set forth above, the defendant should be held without bail pending trial.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/
    Artie McConnell
    Assistant U.S. Attorney
    (631) 715-7825