

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:JAM
F.# 2017R01195

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 7, 2020

<u>By ECF and Hand Delivery</u>

The Honorable Joanna Seybert
United States District Judge
United States District Court
Eastern District of New York
Central Islip, New York 11722

    Re: United States v. Zoobia Shahnaz
       <u>Docket No. 17-CR-690 (S-1) (JS)</u>

Dear Judge Seybert:

    The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for February 21, 2020.  On November 26, 2018, the defendant, Zoobia Shahnaz, pled guilty to providing material support to a foreign terrorist organization, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18 U.S.C. § 2339B(a)(1).  The defendant's total offense level is 37, which provides for an advisory sentencing range per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") of 360 months to life imprisonment.  However, because the count of conviction has a statutory maximum of 20 years, the defendant's effective Guidelines range is 240 months.  The defendant stipulated to this Guidelines calculation in a written plea agreement with the government.  This is also the same range calculated by the Department of Probation in the Pre-Sentence Investigation Report ("PSR").  <u>See</u> PSR at ¶¶ 25-35.

    For the reasons set forth in the PSR and herein, the government respectfully requests that the Court impose a Guidelines sentence of 240 months imprisonment.  The defendant not only conspired to join ISIS, but provided thousands of dollars to be used towards its destructive, violent ends.  Her conduct warrants the maximum possible sentence.

Offense Conduct and Procedural History[1]

The PSR accurately summarizes the offense conduct. See PSR at ¶¶ 4-22. As described in the PSR and herein, an investigation by agents from the Federal Bureau of Investigation ("FBI") and members of the Joint Terrorism Task Force ("JTTF") revealed that the defendant engaged in a scheme to defraud several financial institutions, allowing her to access over $85,000 in illicit proceeds. The defendant then wired these funds – as well as additional monies, totaling $150,000 – to various individuals and front companies overseas that were associated with ISIS. Shortly after consummating these transaction, on July 31, 2017, the defendant herself attempted to travel to Syria and join ISIS.

I. Background on ISIS

  A. Evolution and Objectives

ISIS is widely recognized as the preeminent terrorist threat in the world today, responsible for more deaths than any other terrorist or extremist group combined over the past several years. While ISIS has been largely defeated in its home territory of Syria and Iraq, it remains capable of launching attacks in those countries, and has also inspired individuals and affiliated groups to stage attacks in other parts of the world, including the United States.

On or about October 15, 2004, the United States Secretary of State designated Jam'at aI Tawhid wa'al-Jihad (popularly known as "al-Qaeda in Iraq" ("AQI")) as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under Section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIS listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On or about September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

ISIS has pursued the objective of an Islamic state, or caliphate, based in the Middle East and Africa that encompasses all Muslims worldwide. ISIS has pursued this objective through, among other means, killing and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion,

---

[1] This proffer of facts – most of which are summarized in the PSR – is not a complete statement of all facts and evidence of which the government is aware. Where the content of communications or documents are described, they are done so in pertinent part and in sum and substance, unless otherwise indicated by quotations.

nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS has recruited thousands of foreign fighters from across the globe to assist with its efforts to expand its so-called caliphate in Iraq, Syria, and other locations in the Middle East and elsewhere. ISIS has also leveraged technology to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists and others have traveled to Syria and Iraq to join ISIS.

The point does not need to be belabored: ISIS has killed countless people, and seeks, without exaggeration, the destruction of the United States of America. See, e.g., United States v. Suarez, 893 F.3d 1330, 1332 (11th Cir. 2018) ("[w]hen the FBI arrested Harlem Suarez, he had already declared allegiance [to ISIS], attempted to recruit others to join him in destroying the United States"), cert. denied, No. 18-6808, 2019 WL 113456 (U.S. Jan. 7, 2019); Doe v. Mattis, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists"); United States v. Khusanov, 731 F. App'x 19 (2d Cir. 2018) (noting that ISIS has a "history of particularly violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this country") (citation omitted).

B. Terrorist Financing and the Cost of Terrorist Attacks

In contrast to the sophisticated attacks of September 11th, which cost about $500,000 and took years of planning to execute, terrorist groups such as ISIS have been able to inflict maximum carnage and mass-casualty attacks for a fraction of the cost. See National Commission on Terrorist Attacks upon the United States, The 9/11 Commission Report (Washington, D.C. 2004); and Windrem, Robert, "Terror on a Shoestring," November 18, 2015, available at (https://www.nbcnews.com/storyline/paris-terror-attacks/terror-shoestring-paris-attacks-likely-cost-10-000-or-less-n465711. By comparison, the 2004 Madrid train bombings were estimated to have cost $10,000, the failed 2007 London car bomb attacks carried an estimated price tag of about $14,000, and the foiled commuter train attack in Cologne, Germany in 2006 was estimated to have cost only $500. See Oftedal, E., The Financing Of Jihadi Terrorist Cells In Europe, The Norwegian Defense Research Establishment, available at http://www.ffi.no/no/Rapporter/14-02234.pdf. The more recent attacks using vehicles, such as the 2016 Nice, France truck attack and the 2010 Times Square car bomb attack, were similarly inexpensive to conduct. Mamtora, Bhakti, "Times Square Car Bomb – How Much Did It Cost," May 7, 2010, available at https://www.cbsnews.com/news/times-square-car-bomb-how-much-did-it-cost/. Indeed, it has been estimated that three-quarters of terror attacks in Europe between 1994 and 2013 cost less than $10,000, which includes all costs associated with the attack such as travel, communication, storage, acquiring of weapons and bomb-making materials. See Institute for Economics and Peace, Global Terrorism Index 2017, pp. 79-83, available at http://visionofhumanity.org/app/uploads/2017/11/Global-Terrorism-Index-2017.pdf.

3

This shift towards inexpensive attacks reflects a shift in tactics by ISIS, which has advocated lone offender and small group attacks that can be carried out quickly, with minimal funding and preparation. Exacerbating this is the wide availability of social media and online communication platforms, which allow ISIS to inspire individuals to carry out attacks against civilian and law enforcement targets worldwide in the name of the caliphate. ISIS has also published how-to guides offering advice on carrying out attacks with low-tech, low-cost weapons such as improvised explosive devices ("IEDs"), vehicles, knives, and arson. See EU Terrorism Situation and Trend Report 2016, EUROPOL (2016), available at, https://www.europol.europa.eu/activities-services/main-reports/european-union-terrorism-situation-and-trend-report-te-sat-2016.

ISIS and other terrorist groups have begun using Bitcoin and other cryptocurrencies to finance terrorist activities.[2] See, e.g., Dion-Schwarz, Cynthia, Manheim, David, and Johnston, Patrick, Terrorist Use of Cryptocurrencies, RAND Corporation (2019). Indeed, the group's loss of territory and isolation from the international banking system make alternative sources of funding and money movements increasingly necessary. Rosenberg, Matthew, "U.S. Drops Bombs Not Just on ISIS, but on Its Cash, Too," New York Times, January 20, 2016.

II. The Defendant

The defendant is a 27-year old citizen of the United States who was born in Pakistan and currently resides in Brentwood, New York. She has no known criminal history. Up until approximately June 15, 2017, she worked as a lab technician at a hospital in Manhattan and earned approximately $71,000 per year. In or about January 2016, the defendant travelled to Jordan to volunteer with the Syrian American Medical Society. For two weeks, she assisted in providing medical aid to Syrian refugees in Amman and in the Zataari Refugee camp, where ISIS exercised significant influence at the time. See, e.g., Malkawi, Khetam, "Jordan Commander: ISIS Increasingly Strong In Syrian Refugee Camp," Associated Press, February 15, 2017.

III. The Defendant's Fraud and Money Laundering Schemes

In or about and between March 2017 and the date of her attempted travel to Syria on July 31, 2017, the defendant engaged in a scheme to defraud numerous financial institutions, netting over $85,000 in illicit funds. She then made several wire transactions to individuals and opaque entities in Pakistan, China and Turkey, which were intended to avoid transaction reporting requirements and conceal the identity, source and destination of the

---

[2] Bitcoin and other cryptocurrencies are digital currencies in which encryption techniques are used to regulate the generation of units of currency and verify the transfer of funds. Cryptocurrencies operate independently of formal banking structures and provide layers of anonymity to their users. Persons engaged in illicit activity such as money laundering and terrorist financing may use cryptocurrencies to avoid detection by law enforcement or intelligence services.

4

illicitly obtained monies. These transactions were designed to provide financial support to ISIS, which the defendant ultimately sought to join in Syria.

### A. The Bank Fraud Scheme

On or about and between March 12, 2017 and March 28, 2017, the defendant applied for and fraudulently obtained approximately six credit cards. Subsequently, in or about and between June 2017 and July 2017, she used these credit cards – along with at least ten other credit cards in her name – to purchase approximately $62,703.61 in Bitcoin and other cryptocurrencies from various internet exchanges. Most of these cryptocurrencies were then converted to U.S. dollars and transferred into a checking account in the defendant's name ("Bank Account 1").

Additionally, on or about June 5, 2017, the defendant applied for and fraudulently obtained a loan of approximately $22,500 from a bank in Manhattan. These monies were also deposited into Bank Account 1 on June 8, 2017.

### B. Laundering of the Illicit Proceeds Overseas

As the defendant obtained stolen funds from her bank fraud scheme, she engaged in a pattern of financial transactions to move the money out of the U.S. to individuals and accounts associated with ISIS. These transactions were designed to disguise the nature of the funds, the purpose of the transactions, and avoid currency transaction reporting requirements.[3]

For example, on or about May 23, 2017, the defendant sent two separate payments of $4,000 and $3,000 to an individual in Pakistan ("John Doe #1") from a Queens-based money remittance service. That same day, the defendant remitted approximately $10,025 from a checking account in her name ("Bank Account 2") via wire transfer, ostensibly to a medical supply company in the Zhejang province of China.

One week later, on or about May 30, 2017, the defendant withdrew approximately $22,000 in cash in three separate transactions - $5,000, $8,000 and $9,000 withdrawals – from accounts in her name at three different banks, including Bank Account 1 and Bank Account 2. With that cash, she sent the following four wire payments later that day from a Queens-based money remittance service:

- Two separate payments of $4,500 and $3,500 to an individual in Karachi, Pakistan (John Doe #2)
- Two separate payments of $4,500 apiece to another individual in Karachi, Pakistan (John Doe #3)

---

[3] Most notably, federal law requires financial institutions to report any deposit, withdrawal, exchange of currency, or other payment or transfer of funds involving more than $10,000.

The following day, on or about May 31, 2017, the defendant wired an additional $20,025 to an account belonging to the aforementioned Chinese medical supply company.

Additionally, records from Bank Account 1 show that on or about July 21, 2017, the defendant made a $100,025.00 remittance via wire transfer to an individual in Ankara, Turkey (John Doe #4). This transaction occurred days before the defendant's attempted travel to Syria and depleted almost all of the funds in Bank Account 1.

In total, the defendant wired over $150,000 overseas to ISIS-related entities. To date, the defendant has not made payments on the credit cards and loans utilized in the scheme.

IV. The Defendant's Fraud and Financial Crimes Were Designed to Support ISIS

During the time she was committing bank fraud and moving money overseas, the defendant accessed ISIS propaganda, violent jihad-related websites and message boards, and social media and messaging pages of known ISIS recruiters, facilitators and financiers. Additionally, the defendant conducted numerous internet searches for maps of and locations within ISIS-controlled territory in Syria, and attempted to locate information that would facilitate her entry into Syria.

As early as August of 2015, the defendant began to conduct extensive internet research on making "hijrah" to Syria and joining ISIS. Hijrah means "migration," and refers to the migration of the Prophet Mohammed and his followers from Mecca to Medina. The term is used by ISIS to describe Muslims from around the world coming to Syria and joining the Islamic State established by ISIS.[4] Examples of the websites and social media pages the defendant accessed include titles such as "Hijrah Checklist," "Hijrah Tips and Reminders," "a message to the hesitant one from jihad hijrah," and "what made you join [ISIS]."

This activity increased during the period of the defendant's bank fraud and money laundering activity, immediately prior to her attempt to travel to Syria on July 31, 2017. Specifically, the defendant engaged in, inter alia, the following internet activity in or about May 2017 through June 2017:

- Accessing pages of known ISIS recruiters, financiers, and fighters, including those who have urged lone-wolf attacks against American targets;
- Searching for "diwan and their functions isis;"[5]
- Viewing videos of ISIS members from the United States and Europe urging Muslims to carry out attacks in Western countries;

---

[4] For example, in February 2015, ISIS published a fifty-page English-language manual distributed online, titled "Hijrah to the Islamic State, 2015," which served as a guide for prospective foreign fighters from Western countries who wanted to join the ranks of ISIS in Syria.

[5] "Diwan" refers to a government financial official or department.

6

- Accessing ISIS-produced internet magazines, including an issue which featured various suggestions to ISIS sympathizers living in the West for hostage takings and attacks;
- Searching for travel-related information, such as "flights to Istanbul," "taking cash while travelling abroad," "travel checks in Turkey," "ATM machine withdrawal limit in Turkey," "how much money can I send myself western union," "hotels in Istanbul close to airport," "how much overdraft can I get," and "sanctions definition;"
- Searching for "medical students ISIS" and accessing the "khilafamedics" Tumblr page;
- Accessing maps of locations along the Turkey-Syria border and cities inside of ISIS-controlled territory; and
- Reading articles about women joining and fighting for ISIS, including one titled "Islamic State: Who are the Top Female Jihadis."

The defendant went to great lengths to try and mask this conduct from law enforcement, using encrypted communications applications and accessing the internet from terminals at her workplace rather than on her personal devices.

Nevertheless, the investigation uncovered statements that the defendant made to third parties where she said, in substance, that it is every Muslim's duty to support ISIS, to pledge allegiance to then-ISIS leader Abu Bakr al-Baghdadi and to travel to Syria and live under sharia law.

V.    After Effectuating Her Fraud and Money Laundering Schemes, the Defendant Attempted to Travel to Syria and Join ISIS

Unbeknownst to her family, the defendant obtained a Pakistani passport and quit her job in June of 2017. On July 31, 2017, while her family believed she was heading to work, the defendant went to John F. Kennedy International Airport ("JFK") to board a flight to Islamabad, Pakistan. Her itinerary included a multi-day layover in Istanbul, Turkey – a common point of entry for individuals travelling from Western countries to join ISIS in Syria. The defendant's return ticket had been booked for September 4, 2017 on a Turkish Airlines flight from Istanbul to JFK. [6]

At JFK, the defendant agreed to speak with law enforcement agents who intercepted her at the gate. The defendant stated, in sum and substance and in pertinent part, that she had scheduled her trip the previous week and planned a six-day layover in Istanbul in order to visit particular mosques and tourist sites. When asked where she planned on staying

---

[6] In its various online guides for those who wish to make hijrah and join the Islamic State via Turkey, ISIS recommends that individuals purchase round-trip itineraries, as one-way tickets to Istanbul will be deemed suspicious by law enforcement. ISIS also recommends that individuals pose as tourists and familiarize themselves with various tourist attractions in Turkey in order to successfully deflect law enforcement questioning and scrutiny. Notably, the defendant had previously conducted internet searches for "one-way tickets to Istanbul."

in Istanbul, the defendant stated that she was unsure. She further stated that she did not know anyone in Istanbul.

During the interview, the defendant was asked about some of the aforementioned overseas wire transactions. She provided false and conflicting explanations, alternately claiming that the transfers were at the behest of an individual she had met on social media, and later for a distant relative in Pakistan. She stated that she was unaware what the money was for and refused to provide further details, saying that such information was "confidential." Additionally, the defendant admitted that she was carrying approximately $9,500 in cash, which she did intentionally in order to avoid currency reporting requirements.

The defendant was also in possession of several electronic devices, and she voluntarily provided written consent for law enforcement to search those items. Analysis of those items show that the defendant took steps to delete stored communications and information prior to arriving at the airport. This is consistent with tradecraft practiced by individuals seeking to travel to Syria and join ISIS.

Following her interview with law enforcement, the defendant was allowed to return to her Brentwood home with her family.

VI. The Defendant's Arrest

On December 13, 2017, the defendant was taken into custody pursuant to an arrest warrant. She was in possession of a smartphone and an MP3 player, both which were searched, pursuant to court-ordered search warrants. A search warrant was also executed at her residence incident to her arrest, yielding other electronic devices and documents. The following summarizes the evidence obtained from these searches, which provided additional evidence that the defendant's financial fraud and money laundering was in support of ISIS, and that the defendant subsequently attempted to travel to Syria and join ISIS.

A. Electronic Devices in the Defendant's Possession

Analysis of the electronic devices in the defendant's possession at the time of her arrest shows that the defendant frequently accessed ISIS propaganda, violent jihad-related websites and message boards, and information that would facilitate her entry into Syria. Most notably, the following audio files were on her MP3 player, and were last accessed by the defendant on July 31, 2017 – the date of her attempted travel to Syria:

- At least six different files containing lectures from Anwar al-Awlaki[7]

---

[7] Anwar Al-Awlaki was a dual citizen of the United States and Yemen, and an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula ("AQAP"), a Yemen-based FTO that has claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea and Yemen since its inception in January 2009. Al-Awlaki played a key role in setting the strategic direction of AQAP, recruited individuals to join AQAP, facilitated training camps in Yemen in support of acts of terrorism, and helped focus AQAP's attempts at planning

- "Hijrah" and "Introduction Hijrah"
- "Jihad with the Messenger of Allah"
- "The Khalifah of the Messenger of Allah"
- "The Governors the Army of Usama"
- "The War Against the Apostates"
- "Establishment of the Islamic State 1"
- "Establishment of the Islamic State 2"
- "Establishment of the Islamic State 3"

As the defendant did not have this MP3 player at the airport on July 31, 2017, she necessarily accessed these audio files prior to her departure. As per common tradecraft practiced by prospective ISIS recruits, the defendant presumably left the MP3 player at home in the event she was subjected to a border search, as it contained terrorist propaganda.

In addition to the aforementioned audio files, the MP3 player also contained several PDF files of extremist literature downloaded from the internet, including poems written by Tarek Mehanna, who was convicted of providing material support to al Qaeda and other terrorism-related crimes in 2012. See United States v. Mehanna, 735 F.3d 32 (1st Cir. 2013).

On the defendant's thumb drive, law enforcement recovered numerous files regarding the political and military situation in Syria. The defendant also had a "checklist" regarding the purchase of Bitcoin and other cryptocurrency. Most significantly, the defendant had a Microsoft Word document, titled "Fb answers," that contained what appeared to be stock, rhetorical responses to counter anti-ISIS postings or sentiments on Facebook and other social media. For example:

- "We have not confirmed that everything told in the western media is in reality true regarding ISIS"
- "According to one source when the Yazidis heard that the muslims were coming they went up to the mountains because they didn't want to live under sharia law and they ran away before ISIS arrived. So they never met ISIS so all the lies that we are being told ISIS massacring them and forced them into conversion is not supported because the Yazidis never met ISIS. They were offered to live under security and stability by ISIS but they refused and due to this they were starving on the mountains. Meanwhile they Christians living in Raqqa province were given security by ISIS."

---

attacks on U.S. interests. For example, Al-Awlaki helped to prepare Umar Farouk Abdulmutallab, the individual who attempted to detonate an explosive device aboard a Northwest Airlines flight to Detroit on December 25, 2009, for his operation. Pursuant to a Presidential Executive Order, Al-Awlaki was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010. Al-Awlaki was killed in Yemen in September 2011.

9

B. <u>Documents and Other Items Recovered from the Defendant's Room</u>

In addition to her electronic devices, law enforcement recovered various notebooks from the defendant's bedroom, containing, <u>inter alia</u>:

- Notes titled "My Duas." A dua is a request made to Allah in the form of a prayer. The defendant's duas included "victory to mujahideen," "make it easy for me to defend jihad," and "give me ur shade[8] on Day of Judgment." Most tellingly, one of the defendant's dua's reads: "make me among Taif al Mansoora," or the "Victorious Group." According to the Koran, the Taif al Mansurah, is "a group from [the] Ummah [community] fighting upon the command of Allah, subjugating their enemies" until Judgment Day. Anwar al-Awlaki frequently invoked the Victorious Group in his preaching and calls for violent jihad, and ISIS has referred to itself as being the Victorious Group.

- Written questions, such as "how many IS cases? What did others say," "what happens if u refuse to answer questions at airport," "what can be obtained from IP…can chats be decrypted? If phone # is known like signal?" "do daily money transactions…reported to FBI," "can they hold my sister accountable for taking me to bank," "does telegram hand over chats," "which phones are tapped" and "any chance of no-fly list."

- Facebook, Twitter, Kik, Instagram and other social media addresses and screen names promoting ISIS and violent jihad-related propaganda, including accounts used by known ISIS fighters, financiers and recruiters. Titles and content of such pages include "Your Ride to Jannah [paradise]," "We will have America on their knees once again, paying the jizya [tax]," "[t]he ONLY solution for the problems of the ummah: jihad," "By Allah we will capture you…AN EYE FOR AN EYE." Photos attached to these social media accounts and postings include, <u>inter alia</u>, men in military fatigues holding automatic weapons, and a photo of a suicide belt of explosives, captioned "C4 and TNT the jewelery of evry women in dawla [the Islamic State] #raqqa #suicidebelt." Several of these social media accounts provided prospective ISIS members advice on making hijrah to Syria, such as "Steeds of War – A Guide Dedicated to the Hijrah to the Land of the Khilaafah."

- A "Mujahideen List," containing the names of several prominent Islamic militants such as Jalaludeen Haqqani, Gulbuddin Hekmatyar and Yunus Khalis.

- License plate numbers of JTTF vehicles that have been dispatched to conduct surveillance of the defendant since July 31, 2017.

---

[8] The "Shade of Allah" is a reference to those in the Koran who are spared on Judgment Day. These individuals will literally be spared from the sun's unbearable heat and be taken into the shade created by Allah's throne.

10

- Notes regarding a RAND Corporation report combating Islamic radicalism, concluding with a note from the defendant: "Ideology of al-Qaeda is the give that keeps it together…what bring the entire ummah together is our aqeedah…pinnacle of our religion is not merely to establish Islam within the sphere of our everyday personal lives, but rather…establish Tawheed [Allah's oneness] on earth…this can only be accomplish through establishing Khilafah!"

- Notes regarding the "mandatory" requirement to "make hijrah if there is an Islamic State…because of the command of Allah."

- Notes regarding the aforementioned money movements to ISIS-affiliated individuals and front companies in Pakistan, China and Turkey.

Also in the defendant's room was a night-vision scope. The defendant had also written the license plate numbers of JTTF and other law enforcement vehicles on the wall near her bed.

VII. The Guilty Plea Proceeding

On November 26, 2018, the defendant pled guilty to Count One of the indictment for providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). In a written plea agreement with the government, the defendant stipulated to the aforementioned financial frauds and money laundering, as well as her attempted travel to Syria to join ISIS. After a complete factual and legal allocution, the defendant's plea was accepted by the Court.

Guidelines Calculation

The government submits that the Guidelines calculation set forth below should be applied:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2M5.3(a)) | | 26 |
| Plus: | Provision of Material Support or Resources with the Intent, Knowledge or Reason to Believe They Were to Be Used To Commit or Assist in the Commission of a Violent Act (U.S.S.G. § 2M5.3(b)(1)(E)) | +2 |
| Plus: | Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a)-(b)) | -3 |
| | Total: | <u>37</u> |

This level carries a range of imprisonment of 360 months to life, as application of the terrorism enhancement places the defendant in Criminal History Category VI. However, because of the

11

statutory maximum sentence, the effective Guidelines range is 240 months. The defendant stipulated to the above Guidelines calculation, and the Department of Probation calculated the same total offense level and Guidelines range. See PSR at ¶¶ 25-35.

## Sentencing Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

## Argument

In this case, the Government's recommended sentence of 240 months is warranted because of, among other things, (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law, (3) the need for specific and general deterrence, and (4) the need to avoid unwarranted disparities in sentencing. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), (a)(6).

I. The Defendant's Conduct Demands the Maximum-Allowable Sentence

It is difficult to overstate the severity of the defendant's conduct. She gravitated towards and embraced the violent ideology of ISIS – a terrorist group that has murdered United States citizens overseas and that has promoted, and taken credit for, lethal attacks against civilians on U.S. soil and throughout the world. Fully aware of this, the defendant provided finances essential to ISIS' terrorist activities, and attempted to provide a resource necessary for its very survival – personnel in the form of herself.

The defendant put $150,000 into the hands of terrorists, which, as discussed previously, is more than enough to finance a mass-casualty attack. To provide additional perspective, the Pentagon has estimated that, on the battlefields of Syria, Iraq and Afghanistan, where U.S. and allied troops continue to engage ISIS forces, a remote-controlled pipe bomb costs approximately $400, a suicide bombing vest approximately $1,200, and a car bomb between $13,000 and $20,000. See Temple-Raston, Dina "How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think," June 25, 2014, available at https://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think. Truly, the funds the defendant sent could be used in countless ways to support ISIS' violent objectives.

The defendant's conduct implicates the core rationale underlying the material support statute. See United States v. Farhane, 634 F.3d 127, 148 (2d Cir. 2011) (Section 2339B "criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm"). As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure – it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." Holder v. Humanitarian Law Project, 561 U.S. 1, 35 (2010). Thus, it is of no moment that the defendant may have intended that the funds she sent to ISIS be used for ostensibly humanitarian or charitable purposes. For example, in Boim v. Holy Land Found, for Relief & Dev., 549 F.3d 685, 690 (7th Cir. 2008) (en banc), the Seventh Circuit held that charitable giving to Hamas necessarily involves an act "dangerous to human life." As Boim reasoned, providing financial support to Hamas, "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people" Id. at 694.

Indeed, the defendant's fraud and money laundering on behalf of terrorists – standing alone – justifies the harshest available sanction. The harm caused by the defendant's $150,000 is incalculable in its scope and lethality.

Yet beyond this, the defendant sought to join ISIS and provide the terrorist organization with an even more valuable resource – herself. As one court, citing Boim, recently held, "[c]ertainly attempting to provide oneself to a designated terrorist organization is at least, if not more, dangerous to human life than merely providing money." United States v. Amri, No. 1:17-CR-50 (LMB), 2017 WL 3262254, at *15 (E.D. Va. July 31, 2017), aff'd sub nom. United States v. Queen, 738 F. App'x 794 (4th Cir. 2018); see also United States v. Taleb-Jedi, 566 F.Supp.2d 157, 167-69 (E.D.N.Y. 2008) ("the provision of personnel, like the provision of money, acts to free up others in a terrorist organization to engage in violence and other acts of terrorism"). This is so not just because the provision of oneself to an FTO frees up the group's resources, but because those who "knowingly [seek] to join a terrorist group…risk…being turned against the United States." United States v. Tounisi, 900 F.3d 982, 986-88 (7th Cir. 2018) (stating that the defendant had "align[ed] himself with a group that advocates for the destruction of the United States and…placed himself at risk of becoming 'a pawn' in a future attack against the country"); see also United States v. Khan, 938 F.3d 713, 718-19 (5th Cir. 2019) "[t]here is also evidence that [defendant] encouraged Garcia to join ISIS and provided funds for him to accomplish that mission, regardless of whether Garcia

13

would be fighting in Iraq or Syria. Garcia did in fact travel to Iraq and joined ISIS. In any event, ISIS is an enemy of the United States."). The defendant's actions directly implicate these concerns.

The defendant's conduct represents a unique and violent brand of criminality that simultaneously shows no respect for human life or the rule of law. She financed and then attempted to join the most deadly and brutal terrorist organization on the planet. Under such circumstances, a 240-month sentence is entirely appropriate.

## II. The Need For Specific and General Deterrence Is High

A lengthy sentence is necessary to deter the defendant, and others like her, from committing future crimes.

### A. General Deterrence

The defendant's financial crimes and her desire to join ISIS involved considerable and deliberate planning and execution. Indeed, her bank fraud and money laundering offenses alone – even ignoring their terrorist purposes – require a sentence that acts as a strong general deterrent. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence") (internal quotation omitted). As with all crimes involving the degree of premeditation evinced by the defendant, a heavy sentence is necessary to deter others that might consider similar conduct.

Yet the deterrence factor is even more acute in terrorism cases. As multiple courts of appeals have recognized, in the terrorism context, the difficulty of deterrence necessitates the imposition of lengthy sentences. See United States v. Saleh, 946 F.3d 97, 112-13 (2d Cir. 2019) ("[t]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." (quoting United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003)); United States v. Ali, 799 F.3d 1008 (8th Cir. 2015). Here, a substantial sentence in this case would send an appropriate and much-needed message to all persons harboring any notion that serving, joining or aiding ISIS in any manner is meaningful and worth the risk. Strong punishment for the defendant's inexcusable conduct sends the appropriate message to others – providing and conspiring to provide material support to terrorist organizations will be pursued aggressively, and those who violate the law in this manner will be convicted and punished accordingly.

### B. Specific Deterrence

Beyond merely fashioning an appropriate general deterrent, the Court's sentence must address the defendant's continuing danger to the community. As demonstrated by the violent and graphic content on her electronic devices, her internet history, and in her own handwritten notes, the defendant was fully aware of the brutal conduct and goals of ISIS

14

and is fully radicalized towards violent jihad. She sought to trade her life in Suffolk County, New York for the violent, hate-filled life created by the Islamic State. In short, the defendant is a dangerous and unpredictable individual who must be incapacitated to protect the public.

Her affinity towards extremist views has not abated with her arrest and incarceration in this case. Specifically, while housed at the Metropolitan Detention Center, the defendant regularly receives various newsletters from Islamist publishers. Indeed, she has subscribed to at least two known ultra-conservative newsletters, "Al-Haq" and "The Majlis," which openly espouse inflammatory and anti-American sentiments.

Although courts have recognized that recidivism ordinarily decreases with age, courts have rejected this reasoning in terrorism cases. Echoing multiple courts of appeals, the Ninth Circuit instructed in United States v. Ressam, "[t]errorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Ressam, 679 F.3d at 1091 (quoting United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011)). There is no particularized information here that overcomes the reasoning expressed by these courts of appeals.

III. A Guidelines Sentence Avoids Unwarranted Sentencing Disparity

A below-Guidelines sentence has no basis, either in the facts of the instant case or in existing precedent.

Generally, untethering terrorism crimes from the Guidelines does not further the interests of justice, nor does it properly follow the Supreme Court's guidance or account for the statutory balancing framework set forth in § 3553(a). A Guidelines sentence reflects the seriousness of this offense and society's expressed contempt for the defendant's conduct. The Sentencing Commission thoughtfully recognizes that terrorism crimes are viewed as one of the most serious classes of crimes in the criminal justice system. Recent events have demonstrated the enormous toll in loss of life that terrorism crimes create in communities across the country. Further, with the spread of ISIS' poisonous ideology into the internet and social media, the jihadist philosophy shows no sign of abating. The Sentencing Guidelines capture this understanding and send the appropriate message to the public.

Furthermore, numerous courts have recognized the need to impose the maximum-allowable period of custody for convictions under Section 2339B, involving only the provision – and often only the attempted provision – of personnel to ISIS and other terrorist organizations:

• Zakaryia Abdin, 17 Cr. 283 (D.S.C.): Abdin, a 20-year old U.S. citizen, was arrested after travelling to Charleston airport after having purchased a ticket to Jordan, from which he would then travel to Egypt and join ISIS. Abdin pledged his allegiance to ISIS and expressed his desire to travel overseas to fight on its behalf. Abdin pled guilty to one count of attempting to provide material support to ISIS and was sentenced to the statutory maximum of 20 years.

15

- Tairod Pugh, 15 Cr. 116 (E.D.N.Y.): Pugh, a U.S. citizen from New Jersey and U.S. Air Force mechanic, travelled from Egypt to Turkey in an effort to cross the border into Syria and join ISIS. Pugh was denied entry by Turkish officials, returned to Egypt, and thereafter deported back to the United States. Soon after arriving back at JFK, Pugh was charged with attempting to provide material support to ISIS. Pugh was convicted and sentenced to the statutory maximum of 15 years on the Section 2339B charge.[9]

- Abdella Tounisi, 13 Cr. 328 (N.D. Ill.): Tounisi made plans to travel to Syria to join Jabhat al-Nusrah, a militant terrorist group associated with al-Qaida. Tounisi visited a purported recruitment website for Jabhat al-Nusrah and emailed the listed contact person, who was actually an FBI agent. Tounisi was arrested at O'Hare International Airport attempting to board a flight to Turkey. Tounisi pled guilty to one count of attempting to provide material support to a terrorist organization and was sentenced to the statutory maximum of 15 years. The Seventh Circuit recently affirmed his sentence.

- Abdurasul Hasanovich Juraboev and Akhror Saidakhmetov, 15 Cr. 95 (E.D.N.Y.): Juraboev and Saidakhmetov were roommates who sought to travel to ISIS-controlled territories. Juraboev and Saidakhmetov were eventually apprehended – Saidakhmetov after attempting to board a flight to Turkey, and Juraboev after purchasing a ticket for a flight to Turkey. Both defendants pled guilty to one count of conspiracy to provide material support to ISIS and were each sentenced to the statutory maximum of 15 years.

- Alla Saadeh, 15 Cr. 0558 (D.N.J.): Saadeh assisted his brother in attempting to join ISIS by paying for his ticket to Jordan. Saadeh also wished to join ISIS himself. Saadeh pled guilty to one count of attempting to provide material support to ISIS and was sentenced to the statutory maximum of 15 years.

- Adam Dandach, 14 Cr. 00109 (C.D. Cal.): Dandach made plans to travel to ISIS-controlled territory, purchased a ticket to fly from Orange County to Turkey, and was arrested at the John Wayne International Airport. Dandach pled guilty to one count of attempting to provide material support to ISIS and passport fraud and was sentenced to the statutory maximum of 15 years on the Section 2339B charge.

Of course, in the instant case, the defendant did far more than seek to join ISIS herself – she put $150,000 into their coffers.[10] Thus, a statutory maximum sentence is appropriate to avoid

---

[9] On June 2, 2015, the Senate passed the USA Freedom Act, increasing the penalty for violations of Section 2339B from 15 to 20 years.

[10] By comparison, the defendants in United States v. Dhirane, 896 F.3d 295 (4th Cir. 2018) were sentenced to 11 and 12 year sentences, under the 15-year statutory maximum, for sending money to al-Shabbab. In United States v. Young, 916 F.3d 368 (4th Cir. 2019), the defendant received a 15-year sentence for providing $245 in gift cards to an undercover agent the defendant believed was an ISIS member.

16

unwarranted sentencing disparities compared to other defendants who engaged in similar or less serious conduct.

## Conclusion

In this case, a Guidelines sentence appropriately captures the defendant's egregious conduct, the continuing danger she and other aspiring terrorists present to the community, and avoids unwarranted sentencing disparities. The government respectfully submits that a term of 240 months imprisonment – the statutory maximum sentence and the applicable Guideline – would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/
Artie McConnell
Assistant U.S. Attorney
Eastern District of New York
718-254-7150

Joseph Attias
Trial Attorney
U.S. Department of Justice
National Security Division
202-616-0736

cc:     Steve Zissou, Esq. (by ECF and E-mail)
        Jared Maneggio, United States Probation Officer (by E-mail)